```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
```

ACE AMERICAN INSURANCE COMPANY                CIVIL ACTION

VERSUS                                        NO. 07-3749

ADMINISTRATORS OF THE TULANE                  SECTION B(5)
EDUCATIONAL FUND

## ORDER AND REASONS

Before the Court is Plaintiff Ace American Insurance Company's Motion for Summary Judgment.  (Rec. Doc. No. 37).  After review of the pleadings and applicable law, and for the reasons that follow,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

**IT IS ORDERED** that Defendant's Motion is **DENIED** on the basis of Tulane's failure to allocate its losses between covered wind losses and excluded flood and mold-related losses under the Allianz and Ace American polices.

**IT IS FURTHER ORDERED** that the Court find as a matter of law that:

1) the Ace American policy excludes damages caused by water that has backed up through a sewer or drain;

2) the Ace American policy excludes damage caused by mold, even if the mold is caused by windstorm; and that

3) the definition of "loss occurrence" in the Ace American policy does not eviscerate the policy's flood exclusion.

*BACKGROUND*

Defendant Administrators of the Tulane Educational Fund ["Tulane"] had in place at the time Hurricane Katrina struck an insurance policy covering its campuses. The policy consisted of four layers of coverage providing a total of $450 million in coverage limits. Lexington Insurance Company ["Lexington"] provided the primary layer of coverage which had a $25 million limit of liability. Zurich American ["Zurich"] provided the first layer of excess insurance, which applied in excess of Lexington's $25 million limits. The Zurich policy had a $75 million limit of liability. Allianz issued the second layer of excess insurance, which applied in excess of Lexington and Zurich's $100 million limit. The Allianz policy had a $250 million limit. Plaintiff Ace American Insurance Company ["Ace American"] issued the final layer of coverage, which applied in excess of the $350 million limits collectively provided by Lexington, Zurich, and Allianz. The Ace American policy had a $100 million limit of liability.

The Ace American policy was an "all risk" policy subject to certain exclusions. Specifically, the policy provided the following:

> This policy does not insure against loss or damage caused by or resulting from any of the following causes of loss regardless of any other cause or event contributing concurrently or in any other sequence to the loss:
>
>     ...
>
>     (B)  Flood;
>
>     ...

2

> (K) This policy does not insure any loss, damage, or expense consisting of, caused by, contributed to, or aggravated by mold, moss, mildew, fungi, spores, bacterial infestation or any similar organism, wet or dry rot and extremes of temperature or humidity, whether directly or indirectly the result of a covered peril. This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expenses or business interruption. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

As a result of Hurricane Katrina, Tulane's campuses sustained damage in excess of $650 million. Subsequently, both Lexington and Zurich paid the policy limits to Tulane. Tulane then reached a settlement agreement with Allianz. Tulane brought suit in state court against Ace American claiming that it had sustained damages in excess of Ace American's point of attachment of $350 million. Ace American then filed suit in federal court for declaratory relief. Specifically, Ace American sought a declaration that no flood coverage existed under the Ace American policy, that the policy provided no coverage related to the presence of mold, and that coverage could not attach under the Ace American policy because the $350 million in coverage underlying the Ace American policy had not been exhausted. Tulane's state court proceeding was then removed and consolidated with the federal court suit for declaratory relief filed by Ace American. Ace American now moves for summary judgment.

Ace American contends that it is entitled to summary judgment as a result of Tulane's failure to allocate its losses between covered wind losses and excluded flood and mold-related losses. Additionally, Ace American claims that given Tulane's failure to allocate its damages, it has failed to show that it has exhausted the Allianz policy limits and is, therefore, precluded from recovering under the Ace American policy. Ace American also argues that the Ace American policy excludes damages caused by water which backed up through sewers or drains as well as all damages caused by mold. Finally, Ace American contends that the definition of the term "loss occurrence" found in the Ace American policy does not negate the policy's flood exclusion.

Tulane contends that summary judgment on the issue of allocation of damages is improper given that Tulane is currently in the process of determining the scope of its losses among the various perils that made up Hurricane Katrina. Additionally, Tulane argues that given the definition of the term "flood" in the Ace American policy, the policy does not exclude damage caused by water which has backed up in a sewer or drain. Further, while the policy contains a mold exclusion, this exclusion does not include mold damages caused by windstorm. Finally, Tulane argues that given the broad definition of "loss occurrence" found in the policy, the policy's flood exclusion clause does not apply to damages caused by a hurricane.

*DISCUSSION*

**A.   Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas,* 139 F.3d 532, 536 (5th Cir. 1998). The nonmovant must go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Id.* Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.* 7 F.3d 1203, 1207 (5th Cir. 1993).

**B.   Allocation of Losses**

Ace American argues first that it is entitled to summary judgment as a result of Tulane's failure to allocate its losses between covered wind losses and excluded flood and mold-related

losses. As discussed above, the coverage provided by Ace American is an "all risk" policy subject to certain exclusions, specifically water and mold damage. Thus, Tulane, as the insured, has the initial burden of proving an accidental direct physical loss to the insured property. *Ferguson v. State Farm Ins. Co.*, 2007 WL 1378507, *1 (E.D. La. 2007). The burden then shifts to Ace American, the insurer, to prove by a preponderance of the evidence that the insured's loss was caused by an excluded peril. *Id*. Finally, the burden shifts back to Tulane to show by a preponderance of the evidence that the loss does not fall within the exclusion or, alternatively, to segregate the amount of covered losses from excluded losses. *Id*.

Ace American contends that it has met its burden of proving that the loss was caused by an excluded peril. In support, Ace American points to the deposition of Tulane's corporate designee in which she states that Tulane sustained water damage in the amount of $350 million. Ace American argues that this testimony proves that at least $350 million of Tulane's damages was caused by flooding. Ace American contends that the burden has now shifted to Tulane to segregate the amount of covered losses from excluded losses. Tulane, however, has failed thus far to set forth any evidence concerning the allocation of wind damage versus flood damage. Thus, Ace American argues that it is entitled to summary judgment.

Assuming that the deposition testimony which Ace American

6

relies on is sufficient to satisfy its burden, this fact alone does not necessarily entitle Ace American to summary judgment on the issue of allocation of damages.  Under the standard outlined above, the ultimate issue of allocation of damages between wind and flood is essentially a factual issue to be decided by the trier of fact in light of the evidence presented at trial.  *See Ferguson*, 2007 WL at *2;  *See also Wellmeyer v. Allstate Ins. Co.*, 2007 WL 1235042, *3 (E.D. La. 2007)(denying summary judgment in favor of insurance company and finding that given the insureds' alleged losses, if the insureds could later demonstrate that segregable wind damage caused those losses, they would be entitled to compensation).  While it is true that Tulane will have the burden of proof at trial to allocate its damages by a preponderance of the evidence, the Court is not aware of case law holding that an insurer is necessarily entitled to summary judgment if the insured fails to meet this burden of proof during the pre-trial discovery phase.  Instead, the issue on summary judgment is whether a genuine issue of material fact exists which would allow a reasonable jury to return a verdict for the nonmovant.  Ace American stresses that summary judgment is proper because Tulane has not offered even a scintilla of evidence regarding allocation of damages.  Thus, no genuine question of fact exists regarding whether Tulane sustained covered damages.  In response, Tulane contends that it is currently in the process of allocating its damages.  Counsel for Tulane has submitted an affidavit stating that "Tulane has retained experts, particularly forensic accountants and cause-and-origin specialists, who are in

7

the process of determining segregating the scope of Tulane's loss among the various perils that made up Hurricane Katrina. Once this segregation is complete, Tulane's experts will allocate specific dollar damages to the segregated losses." Tulane Affid. ¶ 5.

Discovery in this case is still ongoing, and Expert Reports are not due until March 25, 2009. Considering this fact along with the representations made by Tulane's Counsel quoted above regarding ongoing attempts to segregate damages, the Court finds that summary judgement on the grounds of Tulane's failure to allocate its damages is premature at this time. *See Gates v. Auto Club Family Ins. Co.*, 2007 WL 1464259, *3 (E.D. La. 2007)(finding that summary judgment on the issue of allocation of damages was premature given that the deadline to complete discovery was still three months away). This finding in no way prejudices Ace American's right to move for summary judgment once discovery is completed in this case, if at that time Tulane has still failed to produce any evidence regarding allocation of its damages.

**C.   Exhaustion of the Allianz Policy**

Ace American also seeks summary judgment on the issue of exhaustion of coverage under the Allianz policy. Specifically, Ace American relies on the following language found in the Ace American policy:

> It is specifically agreed that no liability shall attach under this policy until and only after the Primary Insurer has paid the full amount of the Primary Coverage and all lower level excess insurer' limits of liability, plus any deductible which might be borne by

>     the   Insured   through   operation   of   any
>     deductible clause in the primary insurance.

Ace American contends that under this language, in order for the Ace American policy to attach, Tulane must first prove that it has incurred damages which are actually covered under the Allianz policy and which reach the Allianz policy limit of $250 million. While the Allianz policy contained flood and mold exclusions, it also contained a "Flood and Water Damage Endorsement" which provided up to $75,000 for flood or water damage per occurrence. Thus, in order for the Ace American policy to attach, Ace American argues that Tulane can attribute $75,000 of its losses to water damage but that it must also prove that it has incurred at least $175 million in additional damages unrelated to water and mold. Ace American claims that Tulane has failed to set forth any evidence of such damages at this time. As the Court found above, however, the fact that Plaintiff has not yet allocated its damages is not a grounds for summary judgment at this time. This finding also applies to the allocation of damages under the Allianz policy for the purpose of attachment of the Ace American policy. Thus, Ace American's Motion for Summary Judgment is denied on these grounds.

**D.   Water Exclusion**

Ace American next argues that it is entitled to a determination that Tulane is precluded from recovering damages caused by water which backed up through sewers or drains.

As stated above, the Ace American policy excludes damage

9

caused by "flood." The policy defines the term "flood" as follows: "Flood, meaning flood waters, surface water, waves, tide or tidal water, the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water, or the spray from any of the foregoing, all whether driven by wind or not." Tulane argues that because this definition does not specifically include damage caused by water which backed up through sewers or drains, the policy covers such water damage.

In response, Ace American points out that in addition to excluding damage caused by "flood" as defined under the Ace American policy, the Ace American policy also states the following:

> The insurance afforded by this policy shall be subject to the same terms and conditions (except as regards premiums, limits of liability and the following conditions) as the Primary Insurer: Lexington Insurance Company, Policy Number 2502285, (hereinafter referred to as the Primary Coverage)....

The Ace American policy also states that the policy does not insure against loss caused by "any peril excluded in the Primary Policy." Thus, under the clear language of the Ace American policy, the policy is subject to the conditions of the Lexington policy, and specifically, it does not insure any loss caused by a peril excluded under the Lexington policy. The Lexington policy, in turn, states the following:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

       ...

       G.   Water

            1)   Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

            2)   Mudslides or mudflow;

            3)   Water that backs up from a sewer or drain; or

            4)   Water under the ground surface pressing on, or flowing or seeping through:

                A)   Foundations, walls, floors or paved surfaces;

                B)   Basements, whether paved or not; or

                C)   Doors, windows or other openings.

Relying on this language, Ace American argues that while the Ace American policy may not specifically exclude damages caused by water that has backed up from a sewer or drain, the Lexington policy does exclude such damage. Thus, the Ace American policy, which is subject to the Lexington policy's terms and conditions, excludes such damages.

    The Court finds that Ace American's interpretation of the Ace American policy is a reasonable one. The language of the Lexington policy clearly excludes damages caused by "water," which includes "water that backs up from a sewer or drain." Although the Ace American policy does not include this particular type of water damage in its definition of the term "flood," the policy also in no

way negates or contradicts the "water" exclusion found in the Lexington policy. Thus, because the Ace American policy is subject to the same terms and conditions as the Lexington policy, the Court finds that the Ace American policy excludes damages caused by water that has backed up through a sewer or drain.

**E.   Mold Exclusion**

Ace American next argues that it is entitled to summary judgment precluding Tulane from recovering damages caused by mold. In doing so, Ace American relies on the language found in exclusion subsection K of the Ace American policy which provides:

> (K)   This policy does not insure any loss, damage, or expense consisting of, caused by, contributed to, or aggravated by mold, moss, mildew, fungi, spores, bacterial infestation or any similar organism, wet or dry rot and extremes of temperature or humidity, whether directly or indirectly the result of a covered peril. This includes, but is not limited to, the cost for investigation, testing, remediation services, extra expenses or business interruption. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Tulane contends, however, that despite this particular exclusion, the Ace American policy does cover mold damage which is caused by windstorm. In support, Tulane relies on exclusion subsection G of the Ace American policy which provides:

> This policy does not insure against...:
>
> ...
>
> (G)   loss or damage caused by, resulting from, contributed to or made worse by actual,

> alleged, or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured in this Policy.
>
> This exclusion shall not apply if seepage or contamination or pollution arises from direct physical loss or damage to insured property from Fire, Lightning, Explosion, Windstorm or Hail, Smoke, Aircraft or Vehicle Impact, Riot, Strike or Civil Commotion, Vandalism, or Leakage From Fire Protection Equipment.
>
> CONTAMINANTS of POLLUTANTS [sic] mean any material which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including but not limited to bacteria, fungi, virus....

Tulane points out that exclusion subsection G quoted above defines the terms "contaminants" and "pollutants" to include "fungi." Further, although the policy does not define the term "fungi," mold is, by definition, a type of fungus. Thus, the exclusion pertains to damage caused by mold. Further, according to the second paragraph of exclusion subsection G, this particular exclusion does not apply if the contamination or pollution (i.e., mold) is caused by windstorm. Thus, Tulane concludes that because the exclusion does not apply to mold damage caused by windstorm, the policy necessarily covers such damage.

The Court is not persuaded by Tulane's reasoning. Even if Tulane is correct that the term "fungi" includes mold and that

13

exclusion subsection G does not encompass mold damage caused by wind, this fact does not in itself negate the clear language of exclusion subsection K which excludes from coverage damage "consisting of, caused by, contributed to, or aggravated by mold, moss, mildew, fungi, spores, bacterial infestation or any similar organism, wet or dry rot and extremes of temperature or humidity, whether directly or indirectly the result of a covered peril." The fact that mold damage may not be excluded under one particular exclusion found in the policy does not mean that it cannot be excluded under a separate exclusion. *Magnon v. Collins*, 739 So. 2d 191, 197 (La. 1999). Thus, given the clear language of exclusion subsection K, the Court finds that the Ace American policy excludes damage caused by mold, even if the mold is caused by windstorm.

**F.   Loss Occurrence Definition**

Finally, Ace American seeks summary judgment regarding the definition of the term "loss occurrence" found in the policy. Specifically, Ace American seeks a determination from the Court that the definition does not eviscerate the flood exclusion found in the policy.

As noted above, the Ace American policy contains a flood exclusion that provides the following.

> This policy does not insure against loss or damage caused by or resulting from any of the following causes of loss regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

14

    ...

    (B)  Flood;

The policy, however, also contains the following provision:

    LIMITS OF LIABILITY

    1.    This Company shall not be liable for more than its pro-rata proportion of:

        $100,000,000 being 100% part of $100,000,000 excess of $350,000,000

    ( )  per location
    (X)  in any one loss occurrence.

The policy also includes an endorsement which defines the term "loss occurrence" as follows:

> [N]otwithstanding any other Definition of Loss Occurrence wording that may be contained in this policy or any clause limiting or attempting to limit the application of any endorsement to the policy, this policy is amended as follows:
>
> <u>DEFINITION OF LOSS OCCURRENCE</u>
>
> The term "loss occurrence" shall mean the sum of all individual losses directly occasioned by any one disaster, accident or loss or series of disasters, accidents or losses arising out of one event which occurs anywhere within the policy territory. However, the duration and extent of any one "loss occurrence" shall be limited to all individual losses sustained by the Insured occurring during any period of 72 consecutive hours arising out of and directly occasioned by the same event, except the term "loss occurrence" shall be further defined as follows:
>
> a)    As regards windstorm, hail, tornado, hurricane, typhoon, cyclone including ensuing collapse and water damage, all

>           individual losses sustained by the
>           Insured occurring during any period of 72
>           consecutive hours arising out of and
>           directly occasioned by the same event.
>
>           ...
>
>     This clause in no way alters any policy limit
>     or policy sublimit expressed.
>
>     All other terms and conditions remain
>     unchanged.

Tulane claims that despite the existence of the flood exclusion, the Ace American policy covers all damages caused by a hurricane, including water damage.  In support, Tulane points out that the "Limits of Liability" section quoted above limits Ace American's liability to $100,000,000 "in any one loss occurrence." Further, the definition of "loss occurrence" in the case of hurricanes includes "ensuing collapse and water damage [and] all individual losses sustained by the insured occurring during any period of 72 consecutive hours arising out of and directly occasioned by the same event."  Thus, while the policy may exclude flood damage, it provides coverage in case of a "loss occurrence" which includes all damages caused by hurricane.  Tulane contends that this interpretation of the policy is supported by the introductory language of the "loss occurrence" endorsement which provides that the definition of "loss occurrence," which includes hurricane damages, applies "[n]otwithstanding any other Definition of Loss Occurrence wording that may be contained in this policy or

16

any clause limiting or attempting to limit the application of any endorsement to the policy."

On the other hand, Ace American argues that the sole purpose of the "loss occurrence" endorsement is to better define what kinds of losses constitute a single occurrence for the purpose of determining the number of limits of liability available to the insured in a particular instance.  The definition, however, was not meant to address the actual scope of coverage afforded by the policy.  Despite the fact that the definition of "loss occurrence" may reference damages caused by a hurricane, the flood exclusion still applies in the case of a hurricane.  In support, Ace American relies on the final provision of the "loss occurrence" endorsement which provides: "This clause in no way alters any policy limit or policy sublimit expressed.  All other terms and conditions remain unchanged."

Analyzing the entire policy as a whole, the Court finds that the "loss occurrence" definition does not eviscerate the flood exclusion.  The term "loss occurrence" itself is used only once in the policy in the "Limits of Liability" section.  While the endorsement then explains what the term "loss occurrence" means in the context of a number of possible events, including a hurricane, given the placement of the actual term in the policy, the purpose of the definition is simply to delineate the number of times that Ace American may potentially be liable for the policy limits in a

17

particular situation. Although Tulane argues that the definition of "loss occurrence" defines the actual scope of coverage, Tulane does not cite, nor is the Court aware of case law that interprets the definition of "loss occurrence" for purposes other than determining the number of actual occurrences. Additionally, although Tulane stresses the fact that the "loss occurrence" endorsement contains an introductory statement that the definition applies notwithstanding any clause attempting to limit the application of any endorsement to the policy, the endorsement also states that all other terms and conditions of the policy are to remain unchanged. The Court finds that the intent behind these provisions, when read together, is that despite any other language in the policy, the term loss occurrence, as it is used in the policy to clarify the number of times that Ace American may potentially be liable for the policy limits, has the definition provided in the endorsement. However, all other terms, including those that affect the actual scope of coverage, such as the flood exclusion, still apply.

In sum, given the limited use of the term "loss occurrence" in the "Limits of Liability" section of the policy as well as the statement in the "loss occurrence" endorsement that all other terms and conditions of the policy remain unchanged, the Court finds that the term "loss occurrence" is meant to clarify how many limits of liability are available to compensate the insured rather than

define the actual scope of coverage.  Thus, the definition of "loss occurrence" does not eviscerate the flood exclusion found in the Ace American policy.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**

**IT IS ORDERED** that Defendant's Motion is **DENIED** on the basis of Tulane's failure to allocate its losses between covered wind losses and excluded flood and mold-related losses under the Allianz and Ace American polices.

**IT IS FURTHER ORDERED** that the Court find as a matter of law that:

1) the Ace American policy excludes damages caused by water that has backed up through a sewer or drain;

2) the Ace American policy excludes damage caused by mold, even if the mold is caused by windstorm; and that

3) the definition of "loss occurrence" in the Ace American policy does not eviscerate the policy's flood exclusion.

New Orleans, Louisiana this 26th day of August, 2008.

UNITED STATES DISTRICT JUDGE